******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* FRANKLIN FOSTER
## (SC 20829)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

The acquittee, who had been found not guilty by reason of mental disease or defect of first degree burglary, risk of injury to a child, third degree assault, and possession of a weapon on school grounds, was committed to the jurisdiction of the Psychiatric Security Review Board in 2003, for a period not to exceed ten years. The acquittee's commitment was extended multiple times by agreement of the parties, but, in 2018, he was granted conditional release and began living in the community, subject to his compliance with certain conditions relating to his ongoing mental health treatment. Thereafter, in 2019, the state filed a petition for an order to extend the acquittee's commitment pursuant to the statute (§ 17a-593 (c)) that permits recommitment when there is reasonable cause to believe that the acquittee "remains a person with psychiatric disabilities . . . to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others . . . ." The acquittee moved to dismiss the state's petition on the ground that the recommitment procedure set forth in § 17a-593 (c) violated his right to equal protection under the United States constitution, but the trial court denied the acquittee's motion to dismiss, granted the state's petition, and extended the acquittee's commitment. In affirming the trial court's order extending commitment, the Appellate Court rejected the acquittee's claim that the recommitment procedure set forth in § 17a-593 (c) violated his right to equal protection and upheld the trial court's finding that the state had proven by clear and convincing evidence that the acquittee suffered from a mental illness that resulted in his being a danger to himself or others. On the granting of certification, the acquittee appealed to this court. *Held*:

The Appellate Court correctly concluded that the recommitment scheme contemplated by § 17a-593 (c) did not violate the acquittee's right to equal protection under the federal constitution.

The acquittee's equal protection claim was premised on the argument that, even though he is similarly situated to convicted inmates who, while already incarcerated, develop psychiatric conditions and are subsequently committed to mental health facilities pursuant to the statutes (§§ 17a-498 (c) and 17a-515) governing civil commitment, the recommitment procedure set forth in § 17a-593 (c) is applied more conservatively than the nominally identical procedure that applies to civilly committed inmates and that such disparate treatment did not withstand intermediate scrutiny.

The acquittee's equal protection claim failed because individuals, such as the acquittee, who are found not guilty by reason of mental disease or defect (insanity acquittees) and who have reached the end of their initial, maximum terms of commitment, are not similarly situated to civilly committed inmates for purposes of commitment.

Specifically, an insanity acquittee's commitment is the product of a judicial determination that the criminal acts that resulted in his commitment were the result of his mental illness, whereas a civilly committed inmate has not acknowledged that he suffers from a mental illness that caused him to engage in criminal conduct, and there is no connection between the civilly committed inmate's criminal behavior and his civil commitment, insofar as the inmate's mental illness and the associated danger to himself or others may develop years after the commencement of the inmate's sentence for his prior criminal behavior.

The Appellate Court properly upheld the trial court's finding under § 17a-593 (c) that there was reasonable cause to believe that the acquittee's discharge would constitute a danger to himself or others, as that finding was not clearly erroneous.

The offenses that led to the acquittee's prosecution, which involved the physical assault of two schoolchildren while the acquittee was experiencing auditory hallucinations, were violent in nature and indicated that his psychotic disorder could seriously endanger the safety of other people, it was appropriate for the trial court to consider the acquittee's offenses in making its determination of dangerousness, even though they occurred more than eighteen years before the state filed its petition for continued commitment in 2019, and, during his nearly two decades of commitment, the acquittee experienced numerous difficulties and forfeited various privileges as a result of engaging in inappropriate and impulsive behavior.

In light of the length of the acquittee's commitment, this court placed particular emphasis on the acquittee's mental health status at or around the time that the state filed the 2019 petition, and, although the acquittee had demonstrated some progress toward recovery and had been granted conditional release during that time period, various medical professionals had expressed concern with the acquittee's discharge, given the short period of time during which he had demonstrated compliance while under supervised release, and the trial court properly credited the testimony of those professionals.

Moreover, the Psychiatric Security Review Board had noted that the acquittee continued to require substantial supervision while on conditional release, and it was appropriate for the trial court, in determining whether the acquittee posed a risk of danger, to consider the degree to which the acquittee's progress was the product of the services, structure, and support that he was receiving and what could potentially happen when the acquittee is no longer required to take medication, to attend counseling, or to have other restrictions in place that may remove potential stressors or triggers.

(*One justice concurring separately*)

Argued December 4, 2024—officially released August 19, 2025

*Procedural History*

Petition for an order extending the acquittee's commitment to the Psychiatric Security Review Board, brought to the Superior Court in the judicial district of Stamford-Norwalk, geographical area number one, where the court, *Hon. Richard F. Comerford, Jr.*, judge trial referee, denied the acquittee's motions to dismiss and to strike; thereafter, the case was tried to the court, *Hon. Richard F. Comerford, Jr.*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment granting the petition, from which the acquittee appealed to the Appellate Court, *Cradle* and *Suarez, Js.*, with *Seeley, J.*, concurring, which affirmed the trial court's judgment, and the acquittee, on the granting of certification, appealed to this court. *Affirmed.*

*Monte P. Radler*, with whom was *Kevin Semataska*, assistant public defender, for the appellant (acquittee).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, were *Paul J. Ferencek*, state's attorney, and *Elizabeth K. Moran*, assistant state's attorney, for the appellee (state).

*Deborah A. Dorfman* filed a brief for Disability Rights Connecticut as amicus curiae.

*Opinion*

MULLINS, C. J. The principal issue in this certified appeal is whether, for purposes of an equal protection challenge, an insanity acquittee[1] who is subject to a

---

[1] "An insanity acquittee is any person found not guilty by reason of mental disease or defect . . . ." (Internal quotation marks omitted.) *State* v. *Dyous*, 307 Conn. 299, 301 n.1, 53 A.3d 153 (2012); see also General Statutes § 17a-580 (1).

petition under General Statutes § 17a-593[2] for continued commitment to the custody of the Psychiatric Security Review Board (board) following the expiration of the maximum period of commitment is similarly situated to a mentally ill prison inmate who is the subject of a petition for civil commitment pursuant to General Statutes §§ 17a-498 (c) and 17a-515 (civilly committed inmate). We conclude that an insanity acquittee who is subject to a petition for continued commitment, regardless of his clinical progress, is not similarly situated to a civilly committed inmate for purposes of the equal protection guarantees under the fourteenth amendment to the United States constitution.

The acquittee, Franklin Foster, appeals, upon our grant of his petition for certification,[3] from the judgment of the Appellate Court, which affirmed the judgment of the trial court granting the state's petition to extend his commitment to the custody of the board. See *State* v. *Foster*, 217 Conn. App. 476, 478, 506, 289 A.3d 191 (2023). On appeal, the acquittee claims, among other things, that the Appellate Court incorrectly concluded that (1) as an insanity acquittee, he was not similarly situated to a civilly committed inmate for purposes of

[2] The legislature amended subsection (g) of § 17a-593 since the events underlying this appeal. See Public Acts 2022, No. 22-45, § 5; see also part I A of this opinion. All references herein to § 17a-593 are to the current revision of the statute unless otherwise indicated.

[3] This court granted the acquittee's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the trial court's factual finding that the acquittee poses a continued risk of danger to himself or to others was supported by clear and convincing evidence?" (2) "Did the Appellate Court correctly conclude that the acquittee was not similarly situated to civilly committed inmates for the purpose of deciding whether . . . § 17a-593, as applied to the acquittee, violated his right to equal protection under the fourteenth amendment to the United States constitution?" And (3) "[i]f the answer to the second question is 'no,' is § 17a-593 subject to rational basis review or to intermediate scrutiny?" *State* v. *Foster*, 346 Conn. 920, 291 A.3d 1041 (2023).

Because we conclude that the answer to question two is "yes," we do not address the third certified issue.

a challenge to § 17a-593 under the equal protection clause of the fourteenth amendment to the United States constitution, and (2) the trial court's finding, pursuant to § 17a-593 (c), that he was mentally ill and dangerous was supported by clear and convincing evidence.[4] We disagree and affirm the judgment of the Appellate Court.

The record reveals the following relevant facts and procedural history, many of which are aptly set forth in greater detail in the opinion of the Appellate Court. See id., 478–82. In 2001, when he was twenty-four years

---

[4] In his brief to this court, the acquittee also asserts two other constitutional claims. First, as a corollary to his claim that the Appellate Court improperly upheld the trial court's finding of dangerousness, the acquittee contends that § 17a-593 is unconstitutionally vague under the Connecticut constitution because the statutory scheme does not provide concrete standards for assessing an insanity acquittee's future dangerousness. Second, the acquittee claims that § 17a-593 violates his equal protection rights under the Connecticut constitution and provides an independent analysis under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), in support of his argument that the state constitution provides him with greater protection than the federal constitution.

We decline to address these state constitutional claims because, as the state points out, the acquittee abandoned them by not raising them before the Appellate Court, which never decided the issues, and because they are outside the scope of the certified issues, limiting our review of the Appellate Court's decision. See, e.g., *Dept. of Public Health* v. *Estrada*, 349 Conn. 223, 250, 315 A.3d 1081 (2024); see also, e.g., Practice Book (2023) § 84-9 (limiting issues appellant can present on appeal to "those set forth in the petition for certification, except where the issues are further limited by the order granting certification"); *State* v. *Saucier*, 283 Conn. 207, 223, 926 A.2d 633 (2007) ("a claim that has been abandoned during the initial appeal to the Appellate Court cannot subsequently be resurrected by the taking of a certified appeal to this court" (internal quotation marks omitted)). Further, we disagree with the acquittee's argument that the present case presents considerations of judicial economy similar to those present in *State* v. *Andres C.*, 349 Conn. 300, 315 A.3d 1014, cert. denied,      U.S.    , 145 S. Ct. 602, 220 L. Ed. 2d 236 (2024), a certified appeal in which we exercised our discretion to review the state's unpreserved, alternative ground for affirmance. See id., 305–306, 315–18 (considering whether sexual assault victim's journals were disclosable statements under rules of practice because, if defendant prevailed in certified appeal and obtained remand for further proceedings, state could raise that claim at that time).

old, the acquittee entered a Greenwich middle school without permission. Id., 478–79. The acquittee possessed two knives; unprovoked, he punched, slapped and kicked a male student and lifted a female student over his head. Id. When apprehended, the acquittee told the police: "I'm here to fight the first person I see. Both of us were in the wrong place at the wrong time." (Internal quotation marks omitted.) Id., 479. "[D]uring the incident at issue, the acquittee was responding to command auditory hallucinations that told him to assault a minor." (Internal quotation marks omitted.) Id., 479 n.1. The acquittee was found not guilty by reason of a mental disease or defect of several index offenses,[5] namely, burglary in the first degree, risk of injury to a child, assault in the third degree, and possession of a weapon on school grounds. Id., 478. The acquittee was subsequently diagnosed with, and continues to experience, schizophrenia or bipolar schizoaffective disorder, as well as borderline intellectual functioning.

Following his insanity acquittal, the acquittee was initially committed in 2003 "to the jurisdiction of the board for a period of time not to exceed ten years, and [he] was subsequently admitted to a psychiatric hospital. By agreement of the parties, the acquittee's commitment was continued by the [trial] court for one year in 2013, two years in 2014, two years in 2016, and one year in 2018." Id., 479.

With respect to the nature of his commitment, the acquittee was initially confined under maximum security conditions for four years at what was then the

---

[5] As the Appellate Court observed, "[t]he psychiatric profession refers to the offenses that led to an acquittee's arrest as 'index offenses.' " *State* v. *Foster*, supra, 217 Conn. App. 487 n.5; see, e.g., M. Kaggwa et al., "Weapon Use During the Index Offense: A Study Among Forensic Psychiatry Patients in Ontario, Canada," 11 Inj. Epidemiology, December 18, 2024, p. 2, available at https://link.springer.com/content/pdf/10.1186/s40621-024-00551-z.pdf (last visited August 13, 2025).

Whiting Forensic Division of the Connecticut Valley Hospital (hospital) in Middletown, from June, 2003, until August, 2007. In August, 2007, the board approved the transfer of the acquittee to the hospital's less restrictive Dutcher Enhanced Security Service (Dutcher). The acquittee began to attend day treatment services in Bridgeport in March, 2012, but resided at the hospital until August, 2013. He then moved to a community outpatient setting until December, 2013, when he was required to return to the hospital because of "inappropriate behavior."

In May, 2014, the board terminated the acquittee's overnight leave but continued to permit him to attend day treatment in the community while residing at Dutcher. That privilege was suspended briefly after the acquittee assaulted another patient in November, 2014, injuring himself but not the other patient.

In 2015, the acquittee underwent neuropsychological testing, which revealed "poor frustration tolerance" and impulsivity. Kevin Trueblood, a forensic psychiatrist, described him as "angry and rigid" in response to clinical staff, particularly female staff who exercised authority over him. Trueblood reported that the acquittee had exhibited some insight into his index offenses and mental illnesses but was "not likely to make much more improvement" in that respect. In a 2016 report, the board indicated that it agreed with Trueblood's concern that, if discharged, the acquittee would become noncompliant with treatment and dangerous.

In 2016 and 2017, the acquittee threatened female hospital staff on multiple occasions, which resulted in the board's decreasing his leave privileges. On one of those occasions, the acquittee blocked a female staff member from exiting a small storage room in a way that left her feeling "barricaded" in that space. On a second occasion, after a staff member tried to "redirect"

the acquittee following an incident with another patient in the dining room, he called that staff member "a derogatory curse word." He then disobeyed staff direction to remain where he was and told a female member that he should " 'slap her for being a snitch.' " On a third occasion, the acquittee told the same female staff member from the storage room incident that he was "out to get [her]."

In September, 2017, the acquittee began to show progress, and the board granted him temporary leave to transition to a residential program in Bridgeport. Trueblood testified that, by that time, the acquittee had denied experiencing any hallucinations or thoughts of harming himself or others and that "[h]is thinking appeared to be organized and goal-directed." As a result, the board granted the acquittee overnight stays at the transitional living center. At the center, the acquittee demonstrated progress, which the board attributed to "a high degree of supervision and support."

After nearly one year of clinical stability and compliance with taking his medication, in the summer of 2018, "the acquittee was granted conditional release, at which time he was discharged from the hospital and began living in the community. His release in the community was conditioned [on] his compliance with several requirements pertaining to his ongoing mental health treatment." *State* v. *Foster*, supra, 217 Conn. App. 479. He has continued living in Bridgeport following his transition to conditional release.

The state filed the petition for continued commitment at issue in this certified appeal in July, 2019. Id. In August, 2019, the board filed a report pursuant to § 17a-593 (d), recommending that the trial court extend the acquittee's commitment for a period of time not to exceed five years. See id., 480. In making this recommendation, the board emphasized that the acquittee had

"a long-standing pattern of inappropriate and impulsive behaviors, which he usually exhibited when frustrated," along with a history of noncompliance with taking his medication. The board noted that, as recently as June 29, 2018, Alexander Westphal, a consulting forensic psychiatrist, had testified in favor of conditionally releasing the acquittee from the hospital to the community. Westphal acknowledged, however, that the acquittee "would pose a risk to himself or others without the substantial conditions proposed for his release."

Given that the acquittee had been on conditional release status for only approximately one year when the state filed its petition for continued commitment, the board emphasized that his "experience living in the community remain[ed] limited and [that] he [was] stable only because of substantial supervision and support, including daily monitored medication; a structured residential program with [forty] hours of mandated programming a week; limited travel in his own custody, in [six] hour increments; and weekly meetings with an individual therapist and conditional release supervisor. Without these mandated safeguards, which his treaters continue[d] to believe [were] required to address his risk, he [was] likely to become noncompliant with treatment and medication, increasing his risk to himself and the community. Given that he would no longer be subject to the safeguards if discharged from the board and that he was only released from hospital confinement during the past year and had not before that resided independently in the community since 2001, the board [found] that he continue[d] to require substantial supervision and that he [could not] reside safely in the community without the board's continued oversight and support."

The acquittee moved to dismiss the state's petition for continued commitment on the ground that the recommitment procedure under § 17a-593 violated his

equal protection rights under the United States constitution, and he later moved to strike the portion of the board's report recommending the extension of his commitment. See *State* v. *Foster*, supra, 217 Conn. App. 479–81.

The trial court held a hearing on the motions and the petition. Id., 481. The court denied the acquittee's motions and subsequently issued a memorandum of decision, granting the state's petition and extending the acquittee's commitment for two years. Id. The court found that the state had established by clear and convincing evidence that the acquittee continues to suffer from (1) "a psychiatric illness diagnosed as schizoaffective disorder, bipolar type," (2) "borderline intellectual functioning," (3) "inappropriate and impulsive behaviors, especially toward females," and (4) "frustration difficulties."

The trial court further found that, although the acquittee's "record indicates progress, his current release into the community is stable because of substantial supervision and support. These mandated safeguards and supervision, including a required pharmaceutical regime, are necessary to avoid increasing his risk to himself and the community. [Although the acquittee] has expressed . . . to [his conditional release supervisor, Madeline Rodriguez, who is a licensed clinical social worker, an intent] to voluntarily comply with mandated safeguards, a sufficient period of time in conditional release status has not passed for the [trial] court to give great weight to any such self-represented intent. [On the basis of] the reliable and probative evidence, the significant nature of the underlying criminal behavior, and the history of [the acquittee], the court finds that he cannot reside in the community without [the board's] continued oversight and support." The trial court later extended that two year commitment to December 1, 2025. See footnote 7 of this opinion.

In March, 2020, the acquittee appealed from the judgment of the trial court to the Appellate Court. *State* v. *Foster*, supra, 217 Conn. App. 481. He first claimed that the trial court "improperly found that the state had proven by clear and convincing evidence that he suffered from a mental illness resulting in his being a danger to himself or others." Id., 482. The Appellate Court rejected this claim. See id. The Appellate Court concluded that the trial court's finding of dangerousness was not clearly erroneous because (1) "during his commitment to the board, the acquittee had made progress and . . . the current level of his release into the community is 'stable' only because of mandated safeguards imposed by the board"; id., 493; and (2) despite the acquittee's expressed intention "to voluntarily comply with mandated safeguards," the record did not establish "a sufficient history of [the acquittee] being in a conditional release status to support a conclusion that he can live in the community without board oversight." Id., 494.

The acquittee's second claim on appeal was that "§ 17a-593, as applied to him, violates his right to equal protection [as] guaranteed by the federal constitution." Id. He contended that "the recommitment procedure that governs acquittees under § 17a-593 is applied more conservatively than the nominally identical commitment procedure that applies to [civilly committed inmates] under § 17a-515, that acquittees are similarly situated to civilly committed inmates for purposes of equal protection analysis, that an intermediate level of scrutiny should be utilized in an equal protection analysis of § 17a-593, and that § 17a-593 cannot withstand such scrutiny." Id., 495. After conducting a comprehensive review of prior decisions from appellate courts that have considered constitutional challenges to § 17a-593, including this court's decisions in *State* v. *Dyous*, 307 Conn. 299, 53 A.3d 153 (2012), and *State* v. *Metz*,

230 Conn. 400, 645 A.2d 965 (1994), the Appellate Court rejected the acquittee's equal protection claim, concluding that he could not establish as a threshold matter that, as an insanity acquittee, he was similarly situated to civilly committed inmates.[6] See *State* v. *Foster*, supra, 217 Conn. App. 498–506. Accordingly, the Appellate Court affirmed the judgment of the trial court. Id., 506. This certified appeal followed.[7]

I

We begin with the principal issue in this appeal, which is the acquittee's claim that the recommitment scheme under § 17a-593 violates his equal protection rights under the United States constitution. He first contends that the Appellate Court incorrectly concluded that, as an insanity acquittee who is subject to recommitment following the completion of his initial maximum term of commitment pursuant to *State* v. *Metz*, supra, 230 Conn. 424–25, he is not similarly situated to a civilly

[6] Judge Seeley authored a concurring opinion, stating that she would have resolved the acquittee's equal protection claims by "follow[ing] the [well-traveled] analytical path established by prior decisions of [this court] and [the Appellate Court] and [by] assum[ing], without deciding, that the acquittee is similarly situated to civilly committed inmates for purposes of the equal protection analysis." *State* v. *Foster*, supra, 217 Conn. App. 507–508 (*Seeley, J.*, concurring); see, e.g., *State* v. *Dyous*, supra, 307 Conn. 316 and n.11. Judge Seeley also concluded that she was bound by this court's decision in *State* v. *Long*, 268 Conn. 508, 535–36, 539–40, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004), "to apply rational basis review to the acquittee's claim of disparate treatment in statutory recommitment procedures for acquittees as compared to civilly committed inmates." *State* v. *Foster*, supra, 528 (*Seeley, J.*, concurring). She ultimately concluded that the acquittee's claim failed because he did not "adequately brief the claim that his right to equal protection had been violated under rational basis review." Id., 528–29 (*Seeley, J.*, concurring).

[7] The acquittee's two year commitment, which would have expired on December 23, 2021, has been extended several times, with the agreement of the parties, throughout the course of these appeals: first to March 21, 2023, then to September 1, 2025, and, finally, to December 1, 2025. The acquittee continues to reside in Bridgeport on conditional release pending a decision from this court.

committed inmate. The acquittee argues that he is "even better situated" than a civilly committed inmate because he has had "years of medication, treatment, and successful community integration" and that he should not be perpetually saddled with his index offenses, which "reflected his mental state at its worst moment." The acquittee further claims that § 17a-593 is subject to intermediate scrutiny for purposes of analysis under the equal protection clause and that the statute fails under that standard because the differential treatment is not substantially related to an important governmental interest. See, e.g., *State* v. *Dyous*, supra, 307 Conn. 318; see also, e.g., *Craig* v. *Boren*, 429 U.S. 190, 197, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976).

We conclude that the acquittee's equal protection claim fails because, as an insanity acquittee, even one whose initial maximum term of commitment has expired, he is not similarly situated to a civilly committed inmate. Primarily, there is a fundamental distinction between the two classes because, in contrast to a civilly committed inmate's commitment, an insanity acquittee's commitment is the product of a judicially determined connection between the index offense and the insanity acquittee's mental illness.

A

Review of Governing Statutory Scheme

An overview of Connecticut's statutory scheme governing the recommitment of insanity acquittees, along with a comparison to that governing civil commitment, provides context for understanding the acquittee's claims on appeal. This court's decision in *State* v. *Dyous*, supra, 307 Conn. 299, explains the two statutory schemes. There are "key disparities between the system applicable to insanity acquittees and the system applicable to civilly committed inmates. These disparities cause the system applicable to insanity acquittees to tilt more

strongly toward confinement. In the most general terms, the system applicable to insanity acquittees, which is administered by the board and the Superior Court, operates such that its primary purpose is to protect the public, whereas the system applicable to civilly committed inmates, which is administered by mental health facilities and the Probate Court, operates such that a paramount concern is to protect a defendant's liberty." Id., 322–23.

"[T]he most obvious reason why divergent outcomes of this sort are possible is that the legislature has imposed different mandates on the two commitment systems." Id., 323. "[F]or acquittees, the legislature has directed the board, in making decisions regarding conditional release, and the Superior Court, in making decisions regarding discharge, to consider that [the] primary concern is the protection of society . . . . General Statutes §§ [17a-584] and 17a-593 (g). In civil commitment proceedings, however, the legislature has directed physicians providing opinions to the Probate Court to consider whether . . . less restrictive placement is recommended and available; General Statutes § 17a-498 (c); and similarly has required the Probate Court to consider whether . . . a less restrictive placement is available . . . . General Statutes § 17a-498 (c)." (Internal quotation marks omitted.) *State* v. *Dyous*, supra, 307 Conn. 323; see also, e.g., *State* v. *Harris*, 277 Conn. 378, 382–85, 890 A.2d 559 (2006) (contrasting civil commitment and insanity acquittee recommittal procedures). Finally, in 2022, the legislature amended § 17a-593 (g) to make clear that the trial court's "secondary concern is the safety and well-being of the acquittee . . . ." Public Acts 2022, No. 22-45, § 5 (P.A. 22-45).

This court's 1994 decision in *State* v. *Metz*, supra, 230 Conn. 400, clarified the burden of proof applicable in acquittees' recommitment proceedings. In *Metz*, this court "conclude[d] that § 17a-593 (c) impliedly imposes

the same burden [of proof] on the state at a hearing for the continued commitment of an acquittee beyond his [or her] current definite period of commitment as is imposed in a civil commitment hearing under § 17a-498 (c); namely, to show by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself or herself or others or gravely disabled." Id., 425.

## B

### General Equal Protection Principles

The following well established principles govern our review of the acquittee's federal equal protection claims, which present "a question of law over which our review is plenary. . . . [T]he concept of equal protection [under the federal constitution] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. . . . Conversely, the equal protection clause places no restrictions on the state's authority to treat dissimilar persons in a dissimilar manner. . . . Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state statute . . . in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . [Accordingly], the analytical predicate [of an equal protection claim] is a determination of who are the persons [purporting to be] similarly situated. . . . The similarly situated inquiry focuses on whether the [challenger is] similarly situated to another group for purposes of the challenged government action." (Citation omitted; internal quotation marks omitted.) *State* v. *Dyous*, supra, 307 Conn. 315.

"Thus, [t]his initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged. . . . Entities are situated similarly in all rele-

vant aspects if a prudent person, looking objectively at the incidents, would [deem] them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the relevant aspects are those factual elements [that] determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." (Citation omitted; internal quotation marks omitted.) Id., 315–16; see also, e.g., *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 140, 157–58, 957 A.2d 407 (2008) (applying equal protection analysis to state constitutional claim).

Establishing that the entities or individuals at issue are similarly situated is a "threshold requirement"; (internal quotation marks omitted) *Keane* v. *Fischetti*, 300 Conn. 395, 403, 13 A.3d 1089 (2011); or "analytical predicate" to the equal protection analysis that we apply under both the federal and state constitutions. (Internal quotation marks omitted.) *State* v. *Wright*, 246 Conn. 132, 139, 716 A.2d 870 (1998); see, e.g., *Ramos* v. *Vernon*, 254 Conn. 799, 826, 761 A.2d 705 (2000); see also, e.g., *Darak* v. *Darak*, 210 Conn. 462, 473, 556 A.2d 145 (1989) (seminal Connecticut case on similarly situated analysis). Only after concluding that the entities or persons at issue are similarly situated does the court go on to determine the standard of review applicable to the equal protection analysis. See, e.g., *Keane* v. *Fischetti*, supra, 403–406; see also, e.g., *State* v. *Angel C.*, 245 Conn. 93, 126 and n.37, 715 A.2d 652 (1998). The three well established equal protection standards of review, ranging from most to least deferential to a challenged classification, are rational basis, intermediate scrutiny, and strict scrutiny. See, e.g., *State* v. *Dyous*, supra, 307 Conn. 317–18.

The statutory classification by itself cannot serve as the defining difference between the classes, i.e., that

one group is named "acquittees" and the other "civil committees," with respect to establishing whether they are similarly situated. Factual differences, not just statutory distinctions, must exist to render the two groups not similarly situated. See, e.g., *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 162–63 (rejecting argument that gay persons are not similarly situated under state constitution to "persons who choose to marry a person of the opposite sex insofar as each of the plaintiffs [sought] to marry a person of the same sex," as "the plaintiffs [could] meet the same statutory eligibility requirements applicable to persons who seek to marry" person of opposite sex and had "multitude of characteristics" in common with opposite sex couples with respect to desire for marriage). In the present case, the threshold question that we must resolve is whether an insanity acquittee is similarly situated to a civilly committed inmate for purposes of considering an extension of commitment.

## C

### Similarly Situated Analysis

Highlighting his therapeutic progress during his term of commitment to the custody of the board, the acquittee seeks to classify himself as similarly situated to a civilly committed inmate because he is now subject to extensions of his since expired initial commitment pursuant to § 17a-593 (c), under the scheme set forth by *State* v. *Metz*, supra, 230 Conn. 424–25. We understand the class implicated by the acquittee's claim to include all of those insanity acquittees who benefit from the construction of § 17a-593 under *Metz* because their initial term of confinement has expired.[8] Although the

---

[8] The acquittee's framing of the classes involved is not entirely clear. On the one hand, in his brief to this court, he refers to himself broadly as a "*Metz* acquittee" throughout the analysis and relies heavily on that decision's treatment of the limited initial term of commitment for purposes of the allocation of the burden of proof in recommitment proceedings. See *State* v. *Metz*, supra, 230 Conn. 424–26. On the other hand, he emphasizes his

acquittee casts this claim as an as applied challenge, this case presents a facial challenge to § 17a-593 as construed by *Metz* "because a determination in his favor necessarily would apply to the continued commitment of all other acquittees" of similar commitment status. *State* v. *Long*, 301 Conn. 216, 244, 19 A.3d 1242, cert. denied, 565 U.S. 1084, 132 S. Ct. 827, 181 L. Ed. 2d 535 (2011) (*Long II*); see also, e.g., id., 244 n.20 ("the distinction between as applied and facial challenges has perplexed litigants, courts and commentators" because, "[o]n one hand, it can refer to the relief sought; on the other hand, it can distinguish the source of the disparate treatment—the text of the statute or those who interpret and apply that text").

individual clinical progress and distinguishes himself factually from the insanity acquittee in this court's leading decision in *State* v. *Dyous*, supra, 307 Conn. 299. In *Dyous*, the insanity acquittee's clinical progress was less than that of the acquittee in this appeal, insofar as the acquittee in *Dyous* had absconded from two hospitals and had continued to experience hallucinations and delusions and to exhibit violent behavior and a general reluctance to take his prescribed medication. See id., 304–307. Indeed, the acquittee in the present case points out that the insanity acquittee in *Dyous* did not challenge the dangerousness finding in that case. See id., 314.

Given the innumerable variations in treatment progress by *Metz* acquittees, with some experiencing minimal or no clinical improvement, others experiencing clinical improvement over a relatively short period of time, and others experiencing a great deal of success over an extended period of time, we view any attempt to define a class based on an insanity acquittee's underlying clinical progress to suffer from fatal unworkability with respect to its identification. See, e.g., *Corey Airport Services, Inc.* v. *Clear Channel Outdoor, Inc.*, 682 F.3d 1293, 1297–98 (11th Cir. 2012) (discussing need for "strongly defined groupings," like race or gender, and noting that, "[f]or a group to qualify properly as identifiable for the purposes of an [e]qual [p]rotection [c]lause claim, substantive group characteristics must pop out that allow [the court] to separate readily entities or people into discrete groupings and clearly identify those persons [who] suffered the alleged discrimination and those persons [who] did not"). As discussed in part II of this opinion, the difficulty of this analysis is further compounded by the difficulty in teasing out the extent to which an acquittee's success is a product of the support and conditions that the acquittee receives because of his commitment to the custody of the board. Accordingly, our treatment of this claim encompasses all insanity acquittees who are subject to recommitment under *Metz*.

Whether an insanity acquittee who has reached the end of his initial term of commitment is similarly situated to a civilly committed inmate for purposes of equal protection challenges under the United States constitution presents an issue of first impression for this court. When Connecticut's appellate courts have considered equal protection challenges to § 17a-593, they have generally assumed, without deciding, that insanity acquittees and civilly committed inmates are similarly situated and have then resolved the case on the merits under varying standards of review. See, e.g., *State* v. *Dyous*, supra, 307 Conn. 316 and n.11, 321–22; *State* v. *Long*, 268 Conn. 508, 535, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004) (*Long I*); *State* v. *Lindo*, 110 Conn. App. 418, 426–27, 955 A.2d 576, cert. denied, 289 Conn. 948, 960 A.2d 1038 (2008). But see *State* v. *Dyous*, supra, 336–39 (*Zarella, J.*, concurring) (resolving equal protection claim by concluding that insanity acquittees are not similarly situated to civilly committed inmates because, as explained by *Jones* v. *United States*, 463 U.S. 354, 367, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983), "insanity acquittees and those who are civilly committed are distinguishable on . . . a fundamental level," given fact that insanity acquittee "has been declared dangerous to society due to the commission of a criminal act . . . which is not the case with a civilly committed inmate whose mental disease or defect was not accompanied by a criminal act").[9]

---

[9] The majority in *Dyous* responded to Justice Zarella's concurrence in a footnote, describing the similarly situated issue as not "nearly so [clear-cut] in light of the important features that the two groups have in common." *State* v. *Dyous*, supra, 307 Conn. 316 n.11. The *Dyous* majority believed that *Jones* v. *United States*, supra, 463 U.S. 370, did not "[provide] guidance with respect to this issue," describing it as "merely determin[ing] that the distinctions between the two classes were sufficient to warrant differential treatment . . . ." (Citation omitted.) *State* v. *Dyous*, supra, 316 n.11. The majority observed that "[i]t may be argued, therefore, that *Jones* supports the view that the two classes *are* similarly situated for equal protection purposes" but stated that it did "not believe . . . that *Jones* sheds any real light on the issue." (Emphasis in original.) Id., 317 n.11. The majority did,

"The similarly situated analysis is not a precise formula, but . . . what is clear is that similarly situated [comparators] must be very similar indeed. . . . This is true because the [e]qual [p]rotection [c]lause does not require things which are different in fact or opinion to be treated in law as though they [are] the same." (Citations omitted; internal quotation marks omitted.) *Monarch Beverage Co.* v. *Grubb*, 138 F. Supp. 3d 1002, 1008 (S.D. Ind. 2015), aff'd sub nom. *Monarch Beverage Co.* v. *Cook*, 861 F.3d 678 (7th Cir. 2017).

In turning to state and federal case law that has considered whether insanity acquittees and those who are committed under civil proceedings—including civilly committed inmates—are similarly situated, we begin with the broad language in the United States Supreme Court's decision in *Jones* v. *United States*, supra, 463 U.S. 354. In *Jones*, the court considered whether an insanity acquittee "must be released because he has been hospitalized for a period longer than he might have served in prison had he been convicted." Id., 356. This question arose in the context of a statutory scheme providing for indefinite and automatic commitment of insanity acquittees, with hearings to consider release held every six months thereafter. See id., 356–58 and n.2, 361.

In rejecting the challenge, the United States Supreme Court held broadly that, "when a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the [federal] [c]onstitution permits the [g]overnment, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity

however, "acknowledge that there is some persuasive force to the state's contention that the two groups actually are not similarly situated—only insanity acquittees necessarily were mentally ill at the time of their prior criminal conduct, for example, and only insanity acquittees were proven to have engaged in such conduct *because* they were mentally ill . . . ." (Emphasis in original.) Id., 316.

or is no longer a danger to himself or society. *This holding accords with the widely and reasonably held view that insanity acquittees constitute a special class that should be treated differently from other candidates for commitment.*"[10] (Emphasis added.) Id., 370; see id., 368 ("[t]he committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous"); see also *Foucha* v. *Louisiana*, 504 U.S. 71, 85–86, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (concluding that insanity acquittee who state conceded was not mentally ill was entitled to release because "*Jones* established that insanity acquittees may be treated differently in some respects from those persons subject to civil commitment").

[10] The United States Supreme Court in *Jones* addressed due process principles in rejecting the insanity acquittee's due process claim that "indefinite commitment is unconstitutional because the proof of his insanity was based only on a preponderance of the evidence, as compared to [the civil commitment] requirement of proof by clear and convincing evidence" under *Addington* v. *Texas*, 441 U.S. 418, 426–27, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). *Jones* v. *United States*, supra, 463 U.S. 366–68. The court observed that, "[i]n equating these situations, [the insanity acquittee] ignore[d] important differences between the class of potential [civil commitment] candidates and the class of insanity acquittees that justify differing standards of proof. The [court in] *Addington* . . . expressed particular concern that members of the public could be confined on the basis of 'some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.' . . . In view of this concern, the [c]ourt [in *Addington*] deemed it inappropriate to ask the individual 'to share equally with society the risk of error.' . . . But [because] automatic commitment . . . follows only if the *acquittee himself* advances insanity as a defense and proves that his criminal act was a product of his mental illness, there is good reason for diminished concern as to the risk of error. More important, the proof that [the acquittee] committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere 'idiosyncratic behavior' . . . . A criminal act by definition is not 'within a range of conduct that is generally acceptable.' " (Citations omitted; emphasis in original; footnotes omitted.) Id., 367. The court concluded that "concerns critical to [its] decision in *Addington* are diminished or absent in the case of insanity acquittees. Accordingly, there is no reason for adopting the same standard of proof in both cases." Id.; see id., 368 ("[t]he preponderance of the evidence standard comports with due process for commitment of insanity acquittees").

Although the court in *Jones* stated that it was not considering the constitutionality of the differences between the release procedures in that case as applicable to insanity acquittees and civilly committed inmates; see *Jones* v. *United States*, supra, 463 U.S. 363 n.11; numerous state and federal courts have applied *Jones'* expansive language in holding that civil committees and insanity acquittees are not similarly situated for purposes of release. Notably, in *Glatz* v. *Kort*, 807 F.2d 1514 (10th Cir. 1986), the United States Court of Appeals for the Tenth Circuit rejected a facial challenge to Colorado's insanity acquittee release statutes, holding that "[i]nsanity acquittees and involuntary civil committees are *not* similarly situated groups for equal protection purposes." (Emphasis added.) Id., 1522. The court emphasized that "the insanity acquittee has confessed to committing a criminal act earlier and the grand jury or the court has found probable cause to believe that he did in fact commit the act," which renders it "not unreasonable to conclude that an insanity acquittal supports an inference of continuing mental illness. . . . These differences dramatically distinguish the involuntary civil committee and make an equal protection comparison inappropriate. They provide a rational basis for distinguishing the criminal committee [that] permits the state to commit the criminal defendant automatically, without the right to a [precommitment] hearing, *and permits a different burden and standard of proof for release*." (Citation omitted; emphasis added; internal quotation marks omitted.) Id.

Numerous other federal and state decisions are consistent with the reasoning of *Glatz*, holding that the different origins of their commitments—and particularly the insanity acquittees' commission of criminal acts—render insanity acquittees and civilly committed individuals not similarly situated for purposes of release. See, e.g., *Hartman* v. *Summers*, 878 F. Supp. 1335,

1345–47 (C.D. Cal. 1995), aff'd, 120 F.3d 157 (9th Cir. 1997); *People* v. *Wilder*, 33 Cal. App. 4th 90, 104–105, 39 Cal. Rptr. 2d 247 (1995); *Lidberg* v. *Steffen*, 514 N.W.2d 779, 784 (Minn. 1994); *Reiter* v. *State*, 36 P.3d 586, 594–96 (Wyo. 2001); see also, e.g., *Ernst J.* v. *Stone*, 452 F.3d 186, 201 (2d Cir. 2006) (observing that, "[i]n the absence of any direct guidance from the [United States] Supreme Court regarding whether its analysis in *Jones* extends to recommitment proceedings, one could argue that because [civilly committed inmates]" have not "acknowledged that they suffer from mental illness" that "caused them to engage in criminal conduct," they "are not [similarly situated] to [conditionally released insanity acquittees] and therefore may be subjected to lower standards of proof in recommitment proceedings"); cf. *Warren* v. *Harvey*, 632 F.2d 925, 928, 930–32 (2d Cir.) (rejecting due process challenge to previous Connecticut statute requiring state to prove dangerousness at insanity acquittee release hearing by preponderance of evidence because "[t]he obvious difference between insanity acquittees and other persons facing commitment is the fact that the former have been found, beyond a reasonable doubt, to have committed a criminal act" and "have 'proved' themselves a danger to society at one time," whereas nonacquittees "have not been found by any [fact finder] to have harmed society as a result of their mental illness"), cert. denied, 449 U.S. 902, 101 S. Ct. 273, 66 L. Ed. 2d 133 (1980).

The acquittee contends, however, that the United States Supreme Court has "issued three seminal equal protection rulings regarding involuntary commitment," namely, *Jackson* v. *Indiana*, 406 U.S. 715, 92 S. Ct. 1845, 32 L. Ed. 2d 435 (1972), *Humphrey* v. *Cady*, 405 U.S. 504, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972), and *Baxstrom* v. *Herold*, 383 U.S. 107, 86 S. Ct. 760, 15 L. Ed. 2d 620 (1966). He quotes the decision of the District of Columbia Circuit Court of Appeals in *United States* v.

*Ecker*, 543 F.2d 178, 197 n.74 (D.C. Cir. 1976), cert. denied, 429 U.S. 1063, 97 S. Ct. 788, 50 L. Ed. 2d 779 (1977), to argue that the *Jackson/Humphrey/Baxstrom* "trio of cases has produced the *Baxstrom* principle, which states that the [s]tate cannot withhold from a few the procedural protections or the substantive requirements for commitment [or release] that are available to all [other civil committees]." (Internal quotation marks omitted.) Citing footnote 34 in *Ecker*, the acquittee also contends that "[t]he *Baxstrom* principle applies equally to acquittees who reach the maximum sentence for the underlying index offense(s)." See *United States* v. *Ecker*, supra, 188 n.34 ("equal protection requires [that] the standards governing the release of criminal [acquittees], who have been confined for a period equal to the maximum sentence authorized for their crimes, to be substantially the same as the standards applicable to civil committees").

We disagree with the acquittee's reading of the *Jackson*, *Humphrey* and *Baxstrom* decisions. As *Jones* recognized, none of these United States Supreme Court cases concerned an insanity acquittee. See *Jones* v. *United States*, supra, 463 U.S. 369 n.19. Moreover, all three decisions, as well as the District of Columbia Circuit's decision in *Ecker*, predated *Jones*.[11] See, e.g.,

---

[11] The acquittee also argues that *Jones* is not controlling because it was a due process, rather than an equal protection, case. We disagree. The United States Supreme Court described the equal protection claim advanced by the insanity acquittee in the lower court in *Jones*, that "it was irrational for the [g]overnment to deny him a [civil commitment] hearing at which the [g]overnment bore the burden of proof by clear and convincing evidence," as "essentially duplicat[ing] [his] due process argument. That is, if the [d]ue [p]rocess [c]lause does not require that an insanity acquittee be given the particular procedural safeguards provided in a [civil commitment] hearing under *Addington* [v. *Texas*, 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)], then there necessarily is a rational basis for equal protection purposes for distinguishing between civil commitment and commitment of insanity acquittees." *Jones* v. *United States*, supra, 463 U.S. 362 n.10; see also *Foucha* v. *Louisiana*, supra, 504 U.S. 84–85 (describing equal protection aspects of *Jones*).

*Seeboth* v. *Allenby*, 789 F.3d 1099, 1106 (9th Cir. 2015) (concluding that, contrary to claim by sexually violent predator, "*Baxstrom* did not sweep so broadly" to establish "that, in the arena of involuntary civil commitment, a state may not deny a right to one group of committed persons that it confers on another group of committed persons"), cert. denied sub nom. *Seeboth* v. *Ahlin*, 577 U.S. 1147, 136 S. Ct. 1168, 194 L. Ed. 2d 190 (2016); *Francis S.* v. *Stone*, 221 F.3d 100, 113 (2d Cir. 2000) (concluding that "*Baxstrom* [was] not decisive" in insanity acquittee case because "[the petitioner in *Baxstrom*] had never been adjudicated mentally ill based on his own plea; he was a prisoner [who] prison authorities had administratively determined should be confined in a prison hospital"); see also, e.g., T. Hafemeister & J. Petrila, "Treating the Mentally Disordered Offender: Society's Uncertain, Conflicted, and Changing Views," 21 Fla. St. U. L. Rev. 729, 743–44 (1994) ("Led by the United States Supreme Court, the courts have reversed their earlier position which had suggested that all [mental] patients were equal. Instead, it is now apparent that disparate rules governing the confinement of [insanity acquittees] are permissible." (Footnote omitted.)).

As this court concluded in *Long I* in rejecting a rational basis challenge, and consistent with federal case law in the wake of *Jones* v. *United States*, supra, 463 U.S. 363, 370, "unlike a civilly committed inmate, an acquittee has proven to the fact finder that his mental disease or defect caused him to commit a crime, thereby establishing a legal nexus between the acquittee's mental illness and the criminal act." *State* v. *Long*, supra, 268 Conn. 540. There is no such inextricable connection between criminal behavior and civil commitment. In the case of a civilly committed inmate, the inmate's mental illness and the associated danger to himself or others may develop many years after the commence-

ment of the inmate's sentence for a criminal conviction arising from conduct that has no connection at all to the inmate's mental illness. In this respect, a civilly committed inmate is no different from any other civilly committed individual, other than the role of the Department of Correction in the custody of that individual before and after his commitment to the custody of the Commissioner of Mental Health and Addiction Services for psychiatric treatment. See General Statutes § 17a-515 ("[t]he provisions of section 17a-498 shall apply to any person regarding whom proceedings for commitment are being instituted under section 17a-513 or 17a-514, and to any other person in the custody of the Commissioner of Correction, except that if the court revokes the order of commitment, the person shall be returned to any institution administered by the Department of Correction as the Commissioner of Correction shall designate, unless his custody in the Commissioner of Correction has terminated, in which case he shall be discharged").

Accordingly, we are persuaded that the distinctions between insanity acquittees and civilly committed inmates render these groups not fair congeners. Fundamentally, the fact that insanity acquittees' mental illnesses have been proven to lead to criminal activity sufficiently distinguishes that group from civilly committed inmates for purposes of commitment. In other words, because the groups are postured differently, the law does not demand that they be treated the same. Thus, we conclude that the acquittee is not similarly situated to a civilly committed inmate for equal protection purposes.

Although we do not review the acquittee's state constitutional argument; see footnote 4 of this opinion; we address his reliance on *State* v. *Metz*, supra, 230 Conn. 424–25, to the extent that it bears on our conclusion that the acquittee is not similarly situated to a civilly committed inmate. The acquittee asserts that to do oth-

erwise would "[impose] the never-ending presumption of dangerousness that *Metz* forbids." We can see the surface level appeal of this reliance on *Metz*, but we ultimately disagree with the acquittee's argument.

In considering the equal protection challenge to § 17a-593 (c) that was raised in *Metz*, this court "construe[d] the statute so as not to place it in constitutional jeopardy." *State* v. *Metz*, supra, 230 Conn. 422–23. In doing so, the court determined that "the maximum period of commitment authorized by [General Statutes] § 17a-582 (e) (1) (A) [is] a reasonably identified point of demarcation beyond which the presumption of dangerousness initially accompanying an acquittee does not continue." Id., 425. Accordingly, the court "conclude[d] that § 17a-593 (c) impliedly imposes the same burden [of proof] on the state at a hearing for the continued commitment of an acquittee beyond his [or her] current definite period of commitment as is imposed in a civil commitment hearing under § 17a-498 (c); namely, to show by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself or herself or others or gravely disabled." Id.

In dictum, the court in *Metz* observed that its "conclusion finds additional support in the equal protection clause of our state constitution, which forbids discrimination on the ground of mental illness. If the defendant were not suffering from mental illness, the state could not constitutionally confine him beyond the maximum term of his criminal convictions. Although the state may well have a compelling interest in the continued commitment of acquittees whose mental illness[es] [make] them dangerous to themselves or others . . . that interest arises only when the state has shouldered the burden of establishing the existence of the underlying facts. . . . Because the underlying criminal conduct may be relatively minor, and indeed need not involve a crime of violence, the presumption of the

existence of facts warranting the defendant's commitment does not survive the expiration of the maximum term of criminal sanctions." (Citations omitted.) Id., 425–26.

Although *Metz* provides some support for the acquittee's position, it is a statutory interpretation case that does not dictate whether insanity acquittees and civilly committed inmates are similarly situated as a matter of law, notwithstanding its dictum referring to the state equal protection clause. See *State* v. *Long*, supra, 268 Conn. 537 n.38. First, this court in *Metz* acknowledged the United States Supreme Court's recognition in *Jones* v. *United States*, supra, 463 U.S. 370, that insanity acquittees are "a special class that should be treated differently from other candidates for commitment"; (internal quotation marks omitted) *State* v. *Metz*, supra, 230 Conn. 414; but it did so in the context of background principles, and it did not squarely consider whether that observation informs release procedures. See id., 424–26. Indeed, in *Dyous*, this court critiqued *Metz* as inconsistent with a "commonsense conclusion that [insanity acquittees subject to recommitment] raise a public safety concern that is not raised to the same extent in the context of civilly committed inmates" and that "[t]he special public safety concern . . . raised by the prospective release of [an insanity acquittee] does not evaporate the moment such a person reaches the end of his maximum term of commitment." *State* v. *Dyous*, supra, 307 Conn. 331 n.18. Second, the dictum in *Metz* relying on the mention of mental disability in the state equal protection clause is unpersuasive. *Metz* was decided prior to *Rayhall* v. *Akim Co.*, 263 Conn. 328, 819 A.2d 803 (2003), which held that, "when the state discriminates *amongst* members of the protected class, invidious discrimination cannot necessarily be presumed." (Emphasis in original.) Id., 344. Accordingly, a legislative classification that differentiates between

two classes of mentally disabled individuals, namely, insanity acquittees and civilly committed inmates, does not automatically receive heightened review, in contrast to those statutes that "[discriminate] *against* the disabled, or a class of the disabled, in favor of the able-bodied," under which invidious discrimination is presumed. (Emphasis in original.) Id.; see *State* v. *Long*, supra, 268 Conn. 539–40 (following *Rayhall* and applying rational basis review to challenge under state constitution because "acquittees and civilly committed inmates are both members of the same class, namely the psychiatrically disabled").

Although this court's conclusion in *State* v. *Metz*, supra, 230 Conn. 425, to apply the same burden of proof as between the two groups may have mitigated a due process issue given the liberty interest created by the maximum term of confinement under § 17a-582 (e) (1) (A), it does not render them similarly situated as a matter of law for purposes of a federal equal protection challenge to § 17a-593 (c).[12] The Appellate Court there-

---

[12] Consistent with the public policy factor of *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992), the acquittee relies on scholarly literature, including articles cited in the amicus curiae brief of Disability Rights Connecticut, and on a legislative task force report to contend that fears of recidivism among insanity acquittees are inflated. The acquittee emphasizes that insanity acquittees, like himself, who have been treated with community support during the protracted reintegration process provided by the conditional release statutes; see General Statutes §§ 17a-588 through 17a-591; have significantly lower rates of reoffending than both offenders who are mentally ill and offenders who are not mentally ill. See, e.g., M. Norko et al., "Assessing Insanity Acquittee Recidivism in Connecticut," 34 Behav. Sci. & L. 423, 439–40 (2016); R. Wise & D. Heinrich, "Toward a More Scientific Jurisprudence of Insanity," 95 Temp. L. Rev. 45, 70–72 (2022); see also, e.g., B. Wendzel, Note, "Not Guilty, Yet Continuously Confined: Reforming the Insanity Defense," 57 Am. Crim. L. Rev. 391, 405, 407 (2020). Given our conclusion that insanity acquittees and civilly committed inmates are not similarly situated for equal protection purposes, we need not engage in detail with the acquittee's public policy arguments, other than to observe that, following the release of a task force report in 2021; see Final Report of the Task Force To Review and Evaluate CVH and WFH, the Psychiatric Security Review Board, and Behavioral Health Care Definitions (December 16, 2021), available at https://www.cga.ct.gov/ph/tfs/20190426 CVH%20Whit-

fore correctly determined that the trial court properly denied the acquittee's motion to dismiss the state's petition for continued commitment. See *State* v. *Foster*, supra, 217 Conn. App. 494–95.

II

We next turn to the acquittee's claim that the Appellate Court incorrectly concluded that the trial court's factual finding that the acquittee poses a continued risk of danger to himself or others was supported by clear and convincing evidence. See id., 494. The acquittee claims that there is no evidence of his dangerousness, rendering the trial court's finding clearly erroneous. The acquittee contends that the trial court's "findings [did] not establish imminent danger and erroneously task[ed] [him] with establishing [that] he is ready for discharge," characterizing "[t]he evidence of potential dangerousness to children and/or women [as] particularly weak." Emphasizing "the temporal remoteness of the index offenses," the acquittee argues that he "has had success in his community placement and [has] made considerable progress toward discharge from the [board]," with "the record . . . devoid of evidence of dangerous behavior . . . directed at schoolchildren, either on hospital grounds or in the community . . . ." Criticizing the Appellate Court's decision as upholding impermissible speculation, the acquittee describes his conduct toward women in the hospital, about which the Appellate Court and trial court were concerned, as "inappropriate relative to hospital or societal norms," but he contends that evidence of this conduct does not

ing%20Task%20Force/CVH%20Whiting%20Final%20Report.pdf (last visited August 13, 2025); legislative activity continues in this highly complex area, with the legislature recently amending § 17a-593 (g) to add the insanity acquittee's "safety and well-being" as a secondary consideration in the trial court's release decision. P.A. 22-45, § 5; see also, e.g., *State* v. *Lockhart*, 298 Conn. 537, 561–62, 4 A.3d 1176 (2010) (legislature is branch of government best suited to make public policy determinations).

satisfy "the [state's] heavy burden of establishing risk of imminent physical injury to a woman." We disagree and conclude that the Appellate Court properly upheld the trial court's finding that reasonable cause exists to believe that the acquittee's discharge would constitute a danger to himself or others.

As previously discussed, § 17a-593 governs proceedings to continue the commitment of an insanity acquittee to the custody of the board. Subsection (c) of the statute provides: "If reasonable cause exists to believe that the acquittee remains *a person with psychiatric disabilities* or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment *would constitute a danger to himself or others*, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee." (Emphasis added.) In making the findings as to the acquittee's "mental condition" and as to whether his discharge would pose a danger to himself or others, the court's "primary concern is the protection of society and its secondary concern is the safety and well-being of the acquittee . . . ." General Statutes § 17a-593 (g); see P.A. 22-45, § 5 (amending § 17a-593 (g) to add acquittee's "safety and well-being" as "secondary concern").

Well established standards guide this court in making its determination under § 17a-593 (c) and (g). "In [a] continued commitment proceeding, the state [bears] the burden of proving by clear and convincing evidence that the acquittee is currently mentally ill and dangerous to himself . . . or others or gravely disabled. . . .

"[T]he confinement of insanity acquittees, although resulting initially from an adjudication in the criminal justice system, is not punishment for a crime. The purpose of commitment following an insanity acquittal,

like that of civil commitment, is to treat the individual's mental illness and [to] protect him and society from his potential dangerousness. The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous. . . . As he was not convicted, he may not be punished. His confinement rests on his continuing illness and dangerousness. . . .

"The determination as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged is a question of fact and, therefore, our review of this finding is governed by the clearly erroneous standard. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Damone*, 148 Conn. App. 137, 164–65, 83 A.3d 1227, cert. denied, 311 Conn. 936, 88 A.3d 550 (2014); see also, e.g., *State* v. *March*, 265 Conn. 697, 710–11, 830 A.2d 212 (2003); *State* v. *Metz*, supra, 230 Conn. 424–26. The trial court "properly" may "[credit] the board's opinion and rel[y] on its findings" in the report rendered pursuant to § 17a-593 (d) in making the dangerousness determination. *State* v. *March*, supra, 712.

As this court held nearly forty years ago in *State* v. *Putnoki*, 200 Conn. 208, 221, 510 A.2d 1329 (1986), "[t]he determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the [acquittee] must be balanced against the security interests of society. . . . *The . . . [court's] inquiry should focus on whether the person is a danger to himself or others, whether he presents . . . the risk of imminent physical injury to others or self . . . .*

[T]he ultimate determination of mental illness and dangerousness is a legal decision . . . [and, in making that determination] the court may and should consider the entire record available to it, including the [acquittee's] history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *State* v. *Damone*, supra, 148 Conn. App. 170–71.

This legal determination of dangerousness is inherently predictive in nature, with the definition of "dangerousness" being "necessarily vague" given the difficulty of the prediction, even with the aid of medical expert testimony. *State* v. *Putnoki*, supra, 200 Conn. 219–20. Further, in this context, the word "[i]mminent" does not mean immediate or likely but, rather, simply "ready to take place" or "hanging threateningly over one's head . . . ." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 277 Conn. 389, quoting Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) p. 580.

It is undisputed that the acquittee has a "psychiatric disabilit[y]" for purposes of § 17a-593 (c).[13] Accordingly, we turn to the trial court's finding that the acquittee was dangerous because he presented the risk of imminent physical injury to himself or others. The acquittee's index offenses of burglary, assault on two schoolchildren, and possession of a weapon on school grounds are indeed violent crimes. Although these crimes took place more than eighteen years before the state filed the operative petition to extend the acquittee's commitment in this case, they nevertheless indicate that the

---

[13] Specifically, it is undisputed that the acquittee's bipolar schizoaffective disorder, along with his cannabis use disorder and his borderline intellectual functioning, is a mental illness that is a "psychiatric disabilit[y]" for purposes of § 17a-593 (c).

acquittee's psychotic disorder induced delusions—when he was not compliant with his medicinal regimen—could seriously endanger the safety of other people, which supports the trial court's finding of dangerousness. See, e.g., *State* v. *Putnoki*, supra, 200 Conn. 221–22 (index offense is part of "past violent behavior" factor); *State* v. *Maskiell*, 100 Conn. App. 507, 509, 523–24, 918 A.2d 293 (considering acquittee's sexual assault index offenses and pedophilia in connection with risks posed by release), cert. denied, 282 Conn. 922, 925 A.2d 1104 (2007).

We agree with the acquittee that the index offenses are an appropriate consideration in the trial court's dangerousness assessment but are not determinative, particularly given the length of his commitment to the custody of the board. The acquittee has had an approximately two decade commitment that was marked by some difficult years spanning from 2003 to at least 2017. The acquittee had difficulty with his transition from the hospital setting that commenced in 2012, losing permission for temporary overnight leaves in 2013 and 2014 as a result of noncompliance with rules, including assaulting another patient. As aptly noted by the Appellate Court, he also engaged in inappropriate and impulsive behavior toward females, including socially inappropriate comments of a sexual nature, before ultimately transitioning to a residential program in Bridgeport in 2017. See *State* v. *Foster*, supra, 217 Conn. App. 489–90 and n.7.

The acquittee has also had some progress intermittently within those years and even more so after 2017, when the board transitioned him to conditional release status with increasing amounts of privileges and independence. Although consideration of the acquittee's entire history is important, given the length of his commitment, we place particular emphasis on his mental status in the years closest to the petition at issue, which

was filed in July, 2019, and which resulted in the board's report dated August 27, 2019. Cf. *State* v. *Putnoki*, supra, 200 Conn. 223 ("[a]n individual's mental and emotional status does not remain static").

Most significant, it was not until 2018, just one year before the state filed the petition for continued commitment that is at issue in this appeal, that the acquittee reached a level of compliance with taking medication and progress sufficient to be granted conditional release. In that approximately one year period during which the acquittee was on conditional release, the acquittee's treaters and evaluators expressed concerns with his discharge from board custody given the short period of time during which he had demonstrated compliance while under supervision on conditional release.

First, Michael Genovese, a licensed clinical social worker, indicated that the acquittee's behavior toward women remained "inappropriate," although his "psychiatric symptoms remained controlled with medication and treatment." Second, Rodriguez, the acquittee's conditional release supervisor, indicated that the acquittee remained functional in the conditional release setting and that he was making progress by doing things such as taking his first unsupervised bus trip. She also noted, however, that "he continued to make inappropriate comments to females" and that he had "expressed the belief that bad things happen in the world because of him"; Rodriguez stated that the acquittee conveyed to her his own concern that "he might be sabotaging his effort to be released from the board's jurisdiction." The trial court properly credited this testimony by medical providers who treated the acquittee and expressed concerns with discharging him at that time, along with the board's recommendation that the acquittee "continues to require substantial supervision and that he cannot reside safely in the community without the board's con-

tinued oversight and support." See, e.g., *State* v. *March*, supra, 265 Conn. 712.

We recognize that the present case, which involves an insanity acquittee who had made progress in his recovery while on conditional release in the community during a lengthy commitment in the custody of the board, presents a circumstance that may well approach the outer limits of when continued commitment to the custody of the board is justified.[14] Especially given the inherently predictive nature of the dangerousness determination; see, e.g., *State* v. *Putnoki*, supra, 200 Conn. 219–20; we agree with the Appellate Court that the degree to which the acquittee's progress is a product of the services, structure, and support that he is receiving while on conditional release is a significant factor in the dangerousness analysis, insofar as denying the peti-

---

[14] The acquittee also relies on a few Superior Court decisions, *State* v. *Ali*, Docket No. UWY-CR4-108157, 2023 WL 4881439 (Conn. Super. July 3, 2023), and *State* v. *Salzman*, Superior Court, judicial district of Middlesex, Docket No. MMX-CR9-6156 (July 12, 2001), in support of his argument that the trial court's dangerousness finding was nothing more than impermissible "speculation" founded on an "assumption that the index offense(s) render an acquittee perpetually dangerous." He argues that the present case is similar to *State* v. *Dickinson*, Docket No. TTD-CR84-0023695, 2006 WL 2053731 (Conn. Super. July 7, 2006), in which the court concluded that the state had not proven by clear and convincing evidence that the acquittee was dangerous. Id., *7. The court rejected the board's conclusion that the acquittee's inappropriate flirtations with several female staff members supported a finding that he was dangerous, and it credited the testimony of four psychiatrists indicating that he was not dangerous. See id., *6–7.

Beyond the deference that we give the trial court's finding under the clearly erroneous standard of review, the three cited cases are distinguishable from the present case. Although both *Ali* and *Salzman* involved dangerous index offenses, arson and attempted murder, respectively, both cases also had uncontroverted findings of low risk of reoffending, lack of evidence of noncompliance with taking medication or setbacks, and delays in moving the acquittees from a hospital setting to community release status that resulted in case-specific decisions to force discharge. See *State* v. *Ali*, supra, 2023 WL 4881439, *1–2; *State* v. *Salzman*, supra, Superior Court, Docket No. MMX-CR9-6156. Moreover, the insanity acquittee in *Dickinson* no longer required psychotropic medication for his illness. See *State* v. *Dickinson*, supra, 2006 WL 2053731, *6.

tion for continued commitment would mean that the acquittee would no longer be required to take advantage of that framework. See *State* v. *Foster*, supra, 217 Conn. App. 493–94. In this respect, an acquittee's willingness to continue treatment and supervision voluntarily is relevant but does not otherwise defeat a finding of dangerousness. See, e.g., *State* v. *Maskiell*, supra, 100 Conn. App. 523–24.

Put differently, the imminence aspect of the dangerousness analysis; see, e.g., *State* v. *Harris*, supra, 277 Conn. 388–89; requires the trial court to consider what may readily happen when an insanity acquittee is no longer required to take medication, to attend counseling, or to have other restrictions in place that may remove potential stressors or triggers. See, e.g., *State* v. *Damone*, supra, 148 Conn. App. 139–40, 162, 171–75 (upholding trial court's recommitment of acquittee, whose index offenses included multiple sexual assaults, even when his major depressive order was in remission with medication and when he was able to hold full-time employment, as acquittee's stability was preserved by board's supervision of treatment and was otherwise at risk given his occasional self-medication with narcotics); *State* v. *Jacob*, 69 Conn. App. 666, 684–85, 798 A.2d 974 (2002) (considering acts of violence that occurred many years prior to hearing and concluding that acquittee's "significant progress toward recovery," including "extended" leaves from hospital and fact that he no longer "require[d] any psychotropic medications," did not undercut trial court's finding of dangerousness when lack of recent dangerous conduct was "due, in part, to the progress he ha[d] made since the time of his original commitment and, in part, to the fact that he ha[d] been confined, supervised and receiving treatment and, therefore, was less likely to [engage in such conduct]"). That the acquittee in the present case has demonstrated significant clinical progress over only a

relatively short period of his lengthy commitment to the custody of the board, and only with the aid of significant support and conditions during his conditional release, supports the trial court's dangerousness finding in this case.

We disagree with the acquittee's argument that considering an insanity acquittee's progress over time, and the extent to which it is the product of the conditions of his commitment, violates *State* v. *Metz*, supra, 230 Conn. 425–26, by shifting the burden of proof from the state to the acquittee. In considering whether the state has proven dangerousness by clear and convincing evidence, the trier of fact must consider, in light of § 17a-593 (g)'s express focus on public safety, the extent to which an insanity acquittee's progress and apparent lack of danger are a product of the conditions under which he is committed to the custody of the board, and what is likely to happen should he lose or no longer be required to take advantage of that support. It is, therefore, more difficult for the state to satisfy its burden of proof when an insanity acquittee has demonstrated success with increasing freedoms and reduced conditions while on conditional release status over a significant period of time.[15] Here, however, the trial

---

[15] We acknowledge the acquittee's argument that "[a] prejudicial factor typically comes into play here," insofar as courts "may be tempt[ed] to err on the side of caution and to continue a person's commitment because you can never be sure." (Internal quotation marks omitted.) *State* v. *Hitt*, 179 Or. App. 563, 573, 41 P.3d 434 (2002). The acquittee argues that this caution "completely eviscerates [*State* v. *Metz*, supra, 230 Conn. 425–26], by effectively thrusting the burden back [on] the acquittee, thereby improperly realigning the respective interests of the acquittee and the state." We are unpersuaded.

*Metz* arose in the case of an acquittee whose continued commitment was under maximum security conditions at Whiting Forensic Institute. See id., 405, 408. The court in *Metz* did not contemplate the extent to which the trial court, in making its dangerousness determination, must consider less restrictive alternatives, such as the conditional release setting at issue in the present case, and how the often lengthy, and often nonlinear, process of transitioning from hospitalization, to community reintegration, and then to release must unfold. Insofar as the parties to the present case do not

court could have considered the one year time frame insufficient, especially in light of the testimony from medical providers (in particular, that of the psychiatrists, Trueblood and Westphal) who expressed concern with how the acquittee would fare upon discharge.

The acquittee, however, argues that the board's concerns are "overstated" because, although his "conduct while in the hospital may have been inappropriate relative to hospital or societal norms . . . it does not [satisfy] the heavy burden of establishing risk of imminent physical injury to a woman." The acquittee relies on the testimony, before the board, of his individual psychotherapist, Daniel Papapietro, to the effect that the reported inappropriate touching was "not sexualized," and, instead, "[i]t's touching one on the shoulder, [or] on their back. It's a childlike flirtatiousness." Indeed, Papapietro and Rodriguez testified that they did not believe that the acquittee would pose a risk were he to reenter the community without conditions. Rodriguez also testified as to the acquittee's intention to continue his treatment.

The trial court was not obligated to credit the testimony of Papapietro and Rodriguez to this effect. It is well settled that, although trial courts may "attach special weight to the testimony of medical experts at a hearing to determine mental status," that testimony is not binding because "psychiatric predictions of future dangerousness are tentative at best and are frequently conceded, even within the profession, to be unreliable." *State* v. *Putnoki*, supra, 200 Conn. 219–20. The trial court is free to reject a treating clinician's testimony in favor of crediting the board's determination as to dangerousness because "the goals of a treating psychiatrist frequently conflict with the goals of the criminal

seek any modification of *Metz* in this respect, we leave that question to another day and, potentially, to legislative action in the meantime.

justice system. . . . [Whereas] the psychiatrist [is] concerned primarily with therapeutic goals, the court must give priority to the public safety ramifications of releasing from confinement an individual who has already shown a propensity for violence." (Citations omitted.) Id., 220–21. Given the prioritization of public safety under § 17a-593 (g), we conclude that the trial court reasonably weighed the fact that Papapietro had testified that the acquittee had in fact refused to take or had missed doses of medication, which raised the potential of decompensation and a psychosis recurrence, with the fact that the acquittee had not acted violently at those discrete points.

Finally, in upholding the trial court's finding of dangerousness, we emphasize that our opinion is limited to the record in connection with *this* petition, which was filed in July, 2019, more than five years prior to oral argument before this court, and which reflects only approximately one year of conditional release—with Westphal's recommendation to grant conditional release status emphasizing that "substantial conditions" were required to keep the acquittee from posing a danger to himself or others. The acquittee's continued therapeutic progress; see, e.g., *State* v. *Putnoki*, supra, 200 Conn. 222–23; and the extent to which the most recent petition for recommitment has become even further removed from the index offenses, should inform the decision on any subsequent petitions for recommitment under § 17a-593. See footnote 7 of this opinion. Accordingly, we conclude that the Appellate Court correctly determined that the trial court's finding of dangerousness, under the circumstances that existed when it was made, was not clearly erroneous.

The judgment of the Appellate Court is affirmed.

In this opinion McDONALD, D'AURIA, ALEXANDER and DANNEHY, Js., concurred.