******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MARVIN NARCISSE
## (AC 48257)

Cradle, C. J., and Moll and Westbrook, Js.

*Syllabus*

The acquittee appealed from the trial court's judgment denying his application for discharge from the jurisdiction of the Psychiatric Security Review Board pursuant to statute (§ 17a-593). He claimed, inter alia, that the court improperly found that he was diagnosed with unspecified bipolar disorder. *Held*:

The trial court's finding that the acquittee suffers from a mental illness was not clearly erroneous, as the court was presented with evidence that could lead a reasonable finder of fact to conclude that the acquittee suffered from unspecified bipolar disorder.

The trial court's conclusion that the acquittee presented a danger to himself or to society was not clearly erroneous, as it was supported by evidence in the record and this court was not left with the definite and firm conviction that a mistake had been made.

Argued February 2—officially released June 9, 2026

*Procedural History*

Application for discharge from the jurisdiction of the Psychiatric Security Review Board, brought to the Superior Court in the judicial district of Bridgeport and tried to the court, *Dayton*, *J*.; judgment denying the application, from which the acquittee appealed to this court. *Affirmed*.

*James B. Streeto*, senior assistant public defender, for the appellant (acquittee).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, were *Joseph Corradino*, state's attorney, and *Jonathan Formichella*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

WESTBROOK, J. The acquittee,[1] Marvin Narcisse, also known as Delmar Rose, appeals from the judgment

[1]Pursuant to General Statutes § 17a-580 (1), the term "acquittee" refers to a defendant who was found not guilty by reason of mental

of the trial court denying his application for discharge from the jurisdiction of the Psychiatric Security Review Board (board) in accordance with General Statutes § 17a-593 (a).[2] On appeal, the acquittee claims that the court improperly **(1)** found that he was diagnosed with "severe personality disorder" and unspecified bipolar disorder and **(2)** concluded that he failed to establish by a preponderance of the evidence that his psychiatric disabilities, if any, do not cause him to be a danger to himself or others. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the court or otherwise undisputed in the record, and procedural history are relevant to our resolution of this appeal. On the afternoon of December 22, 2011, the victim, Marjorie Meketa, who was seventy-seven years old, exited a store located near the intersection of William Street and Roosevelt Street in Bridgeport. The acquittee ran toward the victim at a high rate of speed and tackled her from behind, causing her to hit her head on the concrete sidewalk. The acquittee then proceeded to stab the victim in the face with the broken off stem of a wine glass. He also stomped on and kicked the victim. Ultimately, it took two men to pull the acquittee away from the victim, but not before she suffered severe injuries. When the police arrived, they arrested the acquittee, and he was charged with attempt to commit murder, assault in the first degree, and assault on an elderly victim in violation of General Statutes §§ 53a-49 and 53a-54a, 53a-59 (a)(1), and 53a-59a, respectively. The acquittee pleaded not guilty to each charge.

On April 26, 2013, the trial court, *Devlin, J.*, issued its memorandum of decision and found the acquittee not guilty by reason of mental disease or defect pursuant to

disease or defect in a criminal proceeding pursuant to General Statutes § 53a-13.

[2]General Statutes § 17a-593 (a) provides in relevant part: "The board . . . may recommend to the court the discharge of the acquittee from custody or the acquittee may apply directly to the court for discharge from custody. . . ."

General Statutes § 53a-13 (a).[3] In reaching its conclusion, the court reviewed reports from Madelon Baranoski, a clinical psychologist, and Alexander Westphal, a psychiatrist. Baranoski performed a series of psychological tests on the acquittee, which revealed both psychotic and mood disorder symptoms. Baranoski concluded that "[the acquittee's] baseline function is likely controlled by his schizotypal, paranoid and narcissistic personality features and mood lability."

Westphal stated in his report that the acquittee exhibited psychiatric symptoms at an early age, but that he was not diagnosed with a mental illness until 2003 when he was in the custody of the Department of Correction (department). The department diagnosed the acquittee with "Psychotic Disorder, Not Otherwise Specified and Intermittent Explosive Disorder" and prescribed him antipsychotic, antidepressant, and mood stabilizing medicines. Westphal ultimately found that the acquittee "was suffering from a mental disease that caused such a degree of confusion and disorganization in him that it prevented him from understanding the wrongfulness of his actions . . . ." He found that the acquittee's behavior was consistent with a portion of his past diagnoses, specifically his diagnoses of schizoaffective disorder, bipolar disorder, and major depression with psychotic features. Additionally, he believed "that the ingestion of substances was not the predominant cause of [the acquittee's] state of mind at the time of the attack."

After reviewing the Westphal and Baranoski reports, the court concluded that the acquittee had met his burden of proof and established that he lacked the capacity to

---

[3]General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

Although § 53a-13 (a) has been amended since the events underlying this case; see Public Acts 2019, No. 19-27, § 1; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 53a-13 (a).

appreciate the wrongfulness of his conduct due to his mental disease or defect. The court found that "the evidence demonstrates that for at least ten years before the crime (and probably longer), the [acquittee] suffered from a mental disease or defect likely classified as a schizoaffective disorder or bipolar disorder." Additionally, the court found that the state's assertion that the acquittee's mental disease was the result of his known drug use was of no moment as his most recent drug test, taken mere months before the index offense,[4] was negative. The acquittee also had continued to exhibit symptoms of mental illness throughout periods of his pretrial incarceration when he ostensibly would have had no access to illicit drugs. On July 31, 2013, the acquittee was committed to the Whiting Service of the Whiting Forensic Division of Connecticut Valley Hospital (Whiting) under the jurisdiction of the board for a maximum term of commitment not to exceed forty years.

As documented in the 2013 Department of Mental Health and Addiction Services (DMHAS) report, which recommended the acquittee's commitment at Whiting, Julie Jacobs, a forensic monitor at Whiting, diagnosed the acquittee with, inter alia, "Schizoeffective Disorder, Bipolar Type, Most Recent Episode Depressed Polysubstance Dependence, In a Controlled Environment," and "Personality Disorder Not Otherwise Specified, with Schizotypal, Narcissistic, Paranoid, and Dependent Traits." Jacobs found that the acquittee "displayed the tendency to minimize how his actions on the day of the crime affected the life of the victim." Jacobs also found that the acquittee "demonstrated dangerous impulsive

---

[4]"[T]he psychiatric profession refers to the offenses that led to an acquittee's arrest as index offenses." (Internal quotation marks omitted.) *State* v. *Foster*, 353 Conn. 1, 6 n.5, 339 A.3d 1093 (2025); see, e.g., M. Kaggwa et al., "Weapon Use During the Index Offense: A Study Among Forensic Psychiatry Patients in Ontario, Canada," 11 Inj. Epidemiol. 66, December 18, 2024, p. 2, available at https://link.springer.com/content/pdf/10.1186/s40621-024-00551-z.pdf (last visited June 1, 2026).

behaviors and poor decision making while unmedicated and experiencing psychotic symptoms."

At the acquittee's March 2016 hearing to review his status, Rebecca Ewald, who holds a master's degree in social work, testified that the acquittee had multiple physical altercations and episodes of aggression spanning from October 2013 to July 2014. At the acquittee's February 2018 hearing to review his status, Ewald testified that the acquittee was involved in additional altercations in March and December 2016. By 2017, the acquittee began showing signs of increased engagement in psychotherapy and was more consistent with his medications, resulting in a demonstrated improvement of his mood stability. As a result of the acquittee's improvements, he was approved for a transfer to Dutcher Service at Whiting (Dutcher), the lower security section of Whiting. A few months after his transfer was approved, the acquittee became engaged in a verbal altercation with another patient. Although the argument was heated, the altercation never became physical. Shortly thereafter, the acquittee apologized to the other patient and took responsibility for his behavior. He also requested to speak with his therapist. After this event, the acquittee's most significant risk factors were his untreated mood symptoms, his history of noncompliance with psychiatric treatment and refusal to take psychotropic medications, and his substantial history of substance abuse.

The 2019 reports on the acquittee's status showed that his engagement with treatment varied after his move to Dutcher. Although the acquittee did not initially exhibit any troublesome behavior, the acquittee stopped taking his psychotropic medications by December 2018, and he stopped participating in all prescribed treatment by February 2019. The acquittee, additionally, lost his level four privileges and attempted to leverage his participation in his prescribed treatment to regain those privileges. It was not until July 2019 that the acquittee began to reengage with his treatment after his attorney warned him that he was at risk of returning to Whiting.

During this time, the acquittee also made a series of threatening and provocative statements to Dutcher's staff and patients.

On July 23, 2021, the board held a hearing to review the status of the acquittee and to determine whether he should remain confined, conditionally released, or discharged. The board determined that the acquittee was still a threat to himself and others and not fit for discharge or conditional release. Paul Bryant, a consulting forensic psychiatrist with DMHAS, testified that the acquittee did not engage in any episodes of physical assault, nor were restraints or seclusion needed. He further explained, however, that the acquittee "did experience several episodes of verbal aggression, assaultive or aggressive posturing, and rule violations." For example, the acquittee waved a pen in the face of a staff member in an agitated and verbally aggressive manner. Bryant also testified that when the acquittee finally reengaged in treatment, he expressed feelings of regret and embarrassment but also had difficulty acknowledging his behavior. Bryant testified that, as of July 23, 2021, the acquittee had psychiatric diagnoses, including "Other Specified Personality Disorder with Antisocial and Narcissistic Traits; Unspecified Bipolar Disorder, Alcohol Use Disorder in Sustained Remission in a Controlled Environment; Cannabis Use Disorder in Sustained Remission in a Controlled Environment; and Phencyclidine [PCP] Use Disorder in Sustained Remission in a Controlled Environment."

At the acquittee's August 11, 2023 board hearing, Bryant testified that the acquittee "had multiple behavioral incidents and rule violations which resulted in many fluctuations to his privilege level over the reporting period." Bryant also testified that, "despite multiple episodes of angry and dysregulated behavior, [the acquittee] did seem to show some progress around recognizing and apologizing for behaviors after they occur in a timelier manner." He noted, however, that the acquittee had not taken some of his medication in "quite some time," including

lorazepam and haloperidol, which are both prescribed to treat severe agitation. Additionally, he testified that the acquittee's continued withdrawal from treatment and other activities whenever he feels slighted or upset is a product of his narcissistic personality structure and his difficulty tolerating feelings of internal distress. Bryant indicated that the acquittee was eager to return to the community but that he required additional work before he would be able to do so successfully. Lastly, he testified that the acquittee's diagnoses remained the same.

The board ultimately concluded, on the basis of the testimony of the treating physicians, that the acquittee continued to struggle with rule adherence, impulse control and demonstrating frustration tolerance skills. Although the board expressed some optimism that the acquittee's condition may improve, it still believed that he required the level of support provided by Whiting for adequate risk mitigation.

On February 6, 2024, pursuant to General Statutes §§ 17a-593 (a)[5] and 17a-580 (11),[6] the acquittee filed with the Superior Court an application for discharge from the jurisdiction of the board. The trial court, *Dayton, J.*, held an evidentiary hearing on the application on July 10, 2024. Three witnesses testified at that hearing: Andrew Meisler, a forensic psychologist; Felix Rivera, a certified addiction counselor; and Bryant. The acquittee called Meisler, who, on the basis of the information available to him, diagnosed the acquittee as suffering from a personality disorder with antisocial and narcissistic traits. He further explained that the acquittee's

[5]General Statutes § 17a-593 (a) provides in relevant part: "[T]he acquittee may apply directly to the court for discharge from custody. The court shall send copies of the recommendation or application to the state's attorney and to counsel for the acquittee. An acquittee may apply for discharge not more than once every six months and no sooner than six months after the initial board hearing held pursuant to section 17a-583."

[6]General Statutes § 17a-580 (11) provides: " 'Person who should be discharged' means an acquittee who does not have psychiatric disabilities or does not have intellectual disability to the extent that such acquittee's discharge would constitute a danger to the acquittee or others . . . ."

long-standing, permanent disorder with a pervasive pattern of thinking supported his conclusion. Additionally, he testified that, although coping skills can be taught and medications can be used to manage mood features and other symptoms, the acquittee's illness is not amenable to treatment.

Meisler, however, did not agree with the board's conclusion that the acquittee suffers from unspecified bipolar disorder. Meisler claimed that, on the basis of his review of the acquittee's psychological reports, no evidence ever existed to support a diagnosis of unspecified bipolar disorder. He testified that, although the acquittee may have had, at times, dysregulated behavior, these were not symptoms of mania, hypomania, or depression, one of which must be present for a diagnosis of bipolar disorder. Additionally, Meisler associated the acquittee's behavior with his use of PCP at the time the diagnoses were made. Meisler believed that the acquittee recognized the severity of his historic substance use and stated that, were he to relapse, it is possible that his diagnoses could return.

Meisler believed that the acquittee's inappropriate sexual behavior, including intentionally exposing his genitalia to doctors and staff, was not symptomatic of a major serious mental illness. Instead, it was his opinion that it was symptomatic of his interpersonal, judgment, and impulse control impairments indicative of his antisocial and narcissistic personalities.

Lastly, Meisler did not believe that the acquittee was "faking good," but, instead, he thought the acquittee was "minimizing" his behavior as evidenced by the fact that the tests did not reflect the acquittee's well documented broader problems with maladaptive beliefs, externalization of blame, poor insight into his own medical illness, and chronic interpersonal conflicts.

The acquittee then called Rivera. Rivera was aware that the acquittee was diagnosed with PCP and cannabis use disorder but was not aware that he was also

diagnosed with alcohol use disorder. Rivera testified that the acquittee's substance abuse is in remission in a controlled environment, as the acquittee's ability to use illegal substances is significantly restrained. Rivera was not aware of any behavioral issues the acquittee had while at Whiting and was not aware of whether the acquittee was being noncompliant with his treatment plan. He testified that the acquittee's discharge plan includes intensive twelve step meetings; however, he acknowledged that the acquittee's success with the discharge plan would be entirely dependent upon the acquittee's willingness to engage with it. Rivera believed, however, that the acquittee would be willing to do so. Lastly, Rivera was unaware of whether the acquittee ever complained about having to undergo random drug testing, even while at Whiting.

Bryant was the last witness called and the state's only witness. In the four years prior to his testimony at the July 10, 2024 hearing, he served as a consulting forensic psychiatrist and met with the acquittee's treatment team weekly and with the acquittee occasionally. During Bryant's meetings with the treatment team, he received updates from the acquittee's psychiatrist, psychologists, social workers, case manager, and nursing staff to ensure that his risks were being effectively managed. Bryant testified that the acquittee's current psychological diagnoses were unspecified bipolar disorder; other specified personality disorder with narcissistic and antisocial traits; and alcohol, cannabis, and PCP use disorders in sustained remission in a controlled environment. These diagnoses have remained the same for approximately seven years.

It was Bryant's opinion that the acquittee's involvement with his treatment team was varied over the years, partly because the acquittee was "unsure how much he really wanted to work on things." Although the acquittee's episodes of physical aggression have become "few and far between," Bryant still described incidents in the six months prior to his testimony where the acquittee

engaged in physical violence toward a patient and verbally threatened a member of the staff.

With respect to the risk the acquittee presents upon a potential release, Bryant believed that the acquittee's lack of insight into his own mental illness could "[create] challenges in [his] treatment relationships, [his] engagement and treatment, which those things usually do end up affecting risk." He further testified that a return to the community after eleven years of hospitalization would be a stressful and challenging event for any individual to endure. He testified: "I think he has this maladaptive behavioral pattern of when he feels insulted or . . . things don't go the way he wants, sometimes of pulling back from treatment. . . . [S]o, I worry . . . that's going to be a factor for him because . . . he's been in [Whiting] for eleven years now. Going back into the community after you've been in such a controlled, confined environment for eleven years is stressful." Bryant further testified that any support the acquittee receives in the community will be entirely dependent upon his willingness to engage in it.

Bryant testified that, at one point, he believed that the acquittee's primary risk factor was his substance abuse. The acquittee, however, recently told him that he was not using any unlawful substances at the time of the index offense. This caused Bryant to change his assessment of the acquittee's risk of violence, as he now was less convinced that the index offense was simply the result of the acquittee's use of illicit substances. Byrant's assessment of the acquittee resulted in his conclusion that both the acquittee and the community would be safer if the acquittee were to be gradually stepped down to a slightly less structured environment that still provided the acquittee with all the resources available at Whiting. Lastly, Bryant testified that it is Whiting's responsibility to determine whether the acquittee is eligible for temporary leave or conditional leave.[7]

[7]Bryant testified that the "stepping down," or "gradual transition," as it was colloquially referred to is simply temporary leave, which is

On October 8, 2024, the trial court issued its memorandum of decision and denied the acquittee's application for discharge.[8] The trial court held that it did not agree with "the acquittee's characterization of his mental health issues as being 'abnormalities manifested only by repeated criminal or otherwise antisocial conduct.'" Instead, the court found that "the acquittee continues to suffer from a mental illness, namely, a severe personality disorder and unspecified bipolar disorder, and his potential dangerousness to the community continues due to those illnesses." Additionally, the court found that "the acquittee's past violent behavior and the nature of the offense of which he was acquitted are relevant factors in determining current dangerousness in this proceeding." The court also found that "the evidence demonstrates that the acquittee has poor insight into the serious nature of his psychiatric illness and fails to appreciate the relationship between his illness and his violent behavior." The trial court concluded that "the acquittee's mental illness would present a danger to himself and others in the community if he [were] released, and accordingly . . . he has failed to meet his burden of showing by a preponderance of the evidence that he is no longer such a danger." This appeal followed.

We begin by setting forth relevant legal standards and our standard of review. First, we must note that "the

"where somebody is granted . . . day visits into the community, and then the next step is overnight visits into the community. . . . [T]hey would still be a hospital patient, although sometimes they'd be spending seven nights a week in the community. . . . [T]he next step would be to apply for conditional release, where . . . they . . . become the community's patient, and they're living there full time."

[8]The trial court reached this conclusion on the basis of "evidence received at the hearing," which included "several [board] reports and six month evaluations from [DMHAS], the investigatory report from the initial incident, [Meisler's] psychological assessment, prior psychological reports and assessments, and prior hearing transcripts . . . ." The trial court also "assessed the weight, if any, to be given specific evidence and measured the probative force of conflicting evidence . . . reviewed all briefs, exhibits, relevant statutes, and case law . . . and . . . [drew] such inferences from the evidence or facts established by the evidence that it deems reasonable and logical."

confinement of **[§ 53a-13]** acquittees, although result-
ing initially from an adjudication in the criminal justice
system, is not punishment for a crime. The purpose of
commitment following an . . . acquittal [by reason of
mental disease or defect], like that of civil commitment,
is to treat the individual's mental illness and protect
him and society from his potential dangerousness. The
committed acquittee is entitled to release when he has
recovered his sanity or is no longer dangerous. . . . As he
was not convicted, he may not be punished. His confine-
ment rests on his continuing illness and dangerousness."
**(Internal quotation marks omitted.)** *Payne* v. *Fairfield
Hills Hospital*, 215 Conn. 675, 683–84, 578 A.2d 1025
**(1990).** "[A]s a matter of due process, an acquittee is
entitled to release when he has recovered his sanity or
is no longer dangerous." *State* v. *Metz*, 230 Conn. 400,
417–18, 645 A.2d 965 **(1994).**

Our Supreme Court has explained that, after an acquit-
tee has applied for discharge from the board's jurisdic-
tion and the board, in accordance with the requirement
of § 17a-593 (d),[9] has filed its report regarding whether
the acquittee should be discharged, the trial court must
hold a hearing on the application, at which the acquittee
bears the burden of proving that he or she is a person who
should be discharged. See General Statutes § 17a-593
(f);[10] see also *State* v. *March*, 265 Conn. 697, 705, 830
A.2d 212 (2003). After the hearing, the court, consider-

[9]General Statutes § 17a-593 (d) provides: "The court shall forward any
application for discharge received from the acquittee and any petition
for continued commitment of the acquittee to the board. The board
shall, within ninety days of its receipt of the application or petition, file
a report with the court, and send a copy thereof to the state's attorney
and counsel for the acquittee, setting forth its findings and conclusions
as to whether the acquittee is a person who should be discharged. The
board may hold a hearing or take other action appropriate to assist it
in preparing its report."

[10]General Statutes § 17a-593 (f) provides: "After receipt of the board's
report and any separate examination reports, the court shall promptly
commence a hearing on the recommendation or application for discharge
or petition for continued commitment. At the hearing, the acquittee
shall have the burden of proving by a preponderance of the evidence
that the acquittee is a person who should be discharged."

ing that its primary concern is the protection of society and its secondary concern is the safety and well-being of the acquittee, must make a finding as to whether the acquittee is a person who should be discharged. See General Statutes § 17a-593 (g)[11]; see also *State* v. *March*, supra, 705. The term "[p]erson who should be discharged" is defined as "an acquittee who does not have psychiatric disabilities . . . to the extent that such acquittee's discharge would constitute a danger to the acquittee or others . . . ." General Statutes § 17a-580 (11).

I

The acquittee first claims that the trial court erred in denying the acquittee's application for discharge because the diagnoses found by the court either were not supported by the evidence or are not psychiatric disabilities under Connecticut law. As we discussed previously in this opinion, the trial court found that the acquittee was suffering from a mental illness, "namely, a severe personality disorder and unspecified bipolar disorder." After careful review and consideration of the totality of the record, we conclude that the court's finding that the acquittee suffers from a mental illness was not clearly erroneous.

This court's "determination as to whether an acquittee is currently mentally ill to the extent that he would pose a danger to himself or the community if discharged is a question of fact and, therefore, our review of this finding is governed by the clearly erroneous standard. . . . A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire

[11]General Statutes § 17a-593 (g) provides: "The court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society and its secondary concern is the safety and well-being of the acquittee, make one of the following orders: (1) If the court finds that the acquittee is not a person who should be discharged, the court shall order the recommendation or application for discharge be dismissed; or (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. The court shall send a copy of such finding and order to the board."

evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority . . . is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Jacob*, 69 Conn. App. 666, 680, 798 A.2d 974 (2002).

The term "psychiatric disabilities," as used in § 17a-593 (c), which is defined under the term " '[m]ental illness' " in our state regulations, is "any mental illness or mental disease as defined by the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association[12] and as may hereafter be amended. This definition includes any mental illness in a state of remission which may become active with reasonable medical probability." (Footnote added.) Regs., Conn. State Agencies § 17a-581-2 (a) (5); see *State* v. *March*, supra, 265 Conn. 706–707. Additionally, we have previously concluded that, although "it would be a better practice for the state to present evidence that an acquittee's diagnosis of a mental illness is based on the [DMS-5]," the trial court may still find that the acquittee is suffering from a mental illness as defined by our statutes and regulations. *State* v. *Dyous*, 198 Conn. App. 253, 268 n.11, 233 A.3d 1138, cert. denied, 335 Conn. 948, 238 A.3d 17 (2020).

In the present case, the trial court explicitly found that the acquittee "continues to suffer a mental illness, namely . . . unspecified bipolar disorder."[13] Unspecified

---

[12]The Diagnostic and Statistical Manual of Mental Disorders will herein be referred to as the DSM-5.

[13]The trial court also found that the acquittee suffers from a "severe personality disorder," which the acquittee claims is not a mental illness enumerated within the DSM-5 and, therefore, cannot support a finding that the acquittee suffers from a mental illness. Although there seems to be evidence supporting the trial court's determination that the acquittee is suffering from "severe personality disorder," we

Bipolar Disorder is defined by the DSM-5 as "presentations in which symptoms characteristic of a bipolar and related disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the bipolar and related disorders diagnostic class." American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (5th Ed. 2013) p. 149.

The record provides sufficient support to establish that the acquittee suffered from unspecified bipolar disorder. The acquittee had a long history of mental illness that was first documented in 2003 when the acquittee was incarcerated. Since then, the acquittee has consistently been found to be suffering from some form of bipolar disorder. In 2013, at the acquittee's commitment hearing, Jacobs diagnosed the acquittee with "Schizoeffective Disorder, Bipolar Type," among other diagnoses. Eight years later, at the July 23, 2021 status hearing, Bryant stated that the acquittee was diagnosed with "Unspecified Bipolar Disorder." Two years after that date, at the acquittee's August 11, 2023 status hearing, the acquittee's diagnosis still had not changed. By the acquittee's July 10, 2024 hearing for his application for discharge, Bryant testified that the acquittee was still diagnosed with unspecified bipolar disorder. The trial court made a factual determination on the basis of evidence that could support the finding that the acquittee is suffering from unspecified bipolar disorder.

The acquittee claims that the evidence provided by his expert, Meisler, should belie Bryant's, Westphal's, and Jacobs' testimony that the acquittee is suffering from unspecified bipolar disorder. Meisler claimed, after his review of the acquittee's mental history, that there was no evidence of hypomania, mania, or depression, one of which is necessary to establish that the acquittee is

need not reach the issue. As we discuss subsequently in this opinion, the record contained sufficient evidence to conclude that the acquittee is suffering from bipolar disorder, which the acquittee concedes is an illness enumerated in the DSM-5.

suffering from unspecified bipolar disorder. Instead, Meisler claimed that the acquittee's dysregulated behavior was likely symptomatic of his use of illicit drugs. Although some of the acquittee's treating physicians once considered this to be a possibility, they soon rejected its plausibility. Prior to the index offense, the acquittee's test for illicit substance use showed that the acquittee was likely not under the influence of illicit substances on the date of the index offense. Furthermore, the acquittee told Bryant that he was not taking illicit substances around the date of the index offense. This caused Bryant to change his risk assessment of the acquittee, as he previously believed that the acquittee's mental illness may have been partially attributable to his illicit substance abuse.

The trial court, as the trier of fact, is free to credit the testimony of one expert over that of another. *State* v. *Leroya M.*, 340 Conn. 590, 618–19, 264 A.3d 983 (2021) ("It is axiomatic that [t]he credibility of expert witnesses and the weight to be given to their testimony . . . on issue of sanity is determined by the trier of fact. . . . We will not . . . substitute our judgment for that of the fact finder with respect to the weight to be given the testimony of the expert . . . witness on the issue of the defendant's sanity." (Citation omitted; internal quotation marks omitted.)). As we previously noted in *State* v. *Dyous*, supra, 198 Conn. 272, "we are mindful of our limited role in this process. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo." (Internal quotation marks omitted.)

After a review of the record, we are not left with the definite and firm conviction that a mistake has been made. The trial court was presented with evidence that could lead a reasonable trier of fact to conclude that the acquittee suffers from a mental illness, namely, unspecified bipolar disorder. Therefore, the trial court did not commit clear error in concluding that the acquittee suffers from a mental illness.

## II

The acquittee next claims that he met his burden of proof of establishing, by a preponderance of the evidence, that his psychiatric disabilities do not cause him to be a danger to himself or others and that the trial court clearly erred by denying his application for discharge. Conversely, the state argues that the record belies the acquittee's claim that he is no longer a danger to himself or others. We agree with the state.

This court has held that "[t]he determination of dangerousness presents a question of fact for the court to resolve. . . . Accordingly, appellate review of a court's dangerousness determination is governed by the clearly erroneous standard." (Citation omitted.) *State* v. *Ardizzone*, 230 Conn. App. 187, 206, 330 A.3d 231, cert. denied, 351 Conn. 920, 333 A.3d 104 (2025). As our Supreme Court held, "[t]he determination of dangerousness in the context of a mental status hearing reflects a societal rather than a medical judgment, in which the rights and needs of the [acquittee] must be balanced against the security interests of society. . . . The . . . [court's] inquiry should focus on whether the person is a danger to himself or others, whether he presents . . . the risk of imminent physical injury to others or self . . . . [T]he ultimate determination of mental illness and dangerousness is a legal decision . . . [and, in making that determination] the court may and should consider the entire record available to it, including the [acquittee's] history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released. . . .

"This legal determination of dangerousness is inherently predictive in nature, with the definition of dangerousness being necessarily vague given the difficulty of the prediction, even with the aid of medical expert testimony. . . . Further, in this context, the word [i]mminent does not mean immediate or likely but, rather, simply ready

to take place or hanging threateningly over one's head . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Foster*, 353 Conn. 1, 32–33, 339 A.3d 1093 (2025); see also *State* v. *Ardizzone*, supra, 230 Conn. App. 205.

In the case before us, the index offense was of an extreme and violent nature. The acquittee, seemingly unprovoked, severely attacked the victim. The acquittee tackled the victim, which caused her to hit her head on the concrete. He then stabbed the victim in the face with the broken stem of a wine glass, kicked and stomped on the victim, and only stopped when two men were able to pull the acquittee away from the victim. As the trial court found, "[t]he nature of the index offense is . . . telling because it speaks to the acquittee's ability to engage in extremely violent behavior when dysregulated." Furthermore, this attack was not symptomatic of the acquittee's substance use as such use was reasonably ruled out by his negative drug tests and conversations with Bryant. The index offense gives insight into the extreme level of violence of which the acquittee is capable when he is dysregulated.

Throughout his confinement, the acquittee has engaged in several acts of verbal and physical violence, including, but not limited to, punching a peer and making inappropriate sexual remarks. The acquittee has shown some improvement. For instance, the acquittee has been able to take accountability for the harm his actions have caused, and his improved behavior resulted in his move to a lower security unit, although his privilege levels in that unit tend to fluctuate. Although the acquittee's condition has generally improved, he still presents several risk factors that pose a potential danger to himself and society.

The acquittee continues to have a history of noncompliance with psychiatric treatment and takes his psychotropic medications only intermittently. The acquittee's six month disengagement from all treatment and Meisler's description of the acquittee as someone who exhibits

"poor insight, poor impulse control, poor interpersonal judgment, and a persisting and pervasive pattern of aggressive posturing and lack of empathy for others or appreciation of the impact of his behavior on others," supports the conclusion that the acquittee presents a significant risk to both himself and others. This assessment is heightened by the fact that the acquittee would not have any support upon his release into the community. As both Bryant and Rivera testified, any treatment, for either his mental illness or substance abuse, would be entirely dependent upon his willingness to engage with such treatment. His conduct during confinement, however, does not provide reason to believe that he would continue to seek the support he needs. Bryant, whose testimony the court credited in its memorandum of decision, stated that the acquittee continues to withdraw from treatment. He also testified that the acquittee lacked insight into his mental illness. Bryant remarked that these both present significant risk factors, as his withdrawal from treatment indicates "difficulty tolerating feelings of internal distress," and his lack of insight into his mental illness creates "challenges in [his] treatment relationships, [and his] engagement and treatment, which . . . usually [does] end up affecting risk."

From a review of the record, the acquittee has made some modest improvements and his treating physicians believe that he is capable of potentially returning to the community in the future. These same physicians, however, also believe that the acquittee needs significantly more work to address his tendency to withdraw from treatment, minimize his mental illness, and avoid accountability. In the absence of these improvements, the acquittee, as reported in the board's June 6, 2024 report, still needs the support provided by Whiting. Therefore, the trial court's conclusion that the acquittee presents a danger to himself or society was not clearly erroneous because it is supported by evidence in the record and we are not left with the definite and firm conviction that a mistake has been made. The trial court, in denying the acquittee's application for discharge, did not commit

clear error by concluding that the acquittee suffers from a mental illness and presents a danger to himself or society, as the acquittee failed to satisfy his burden under § 17a-593 (a).

The judgment is affirmed.

In this opinion the other judges concurred.